THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH : | |
| OF ONE ALCATEL FLIP PHONE, : | |
| BLACK IN COLOR, RECOVERED : | MAG. NO. 20-mj-1807 |
| FROM ROMEL BOLGER'S KIA : | |
| SORRENTO ON AUGUST 19, 2020 : | |
| PRESENTLY IN DEA CUSTODY : | |

**AFFIDAVIT**

I, Orest Zachariasevych, Special Agent, Drug Enforcement Administration ("DEA"), Philadelphia, Pennsylvania ("PA"), being duly sworn, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. Your affiant makes this affidavit in support of an application for a Search Warrant authorizing the examination of one cellular telephone, which is currently in DEA's possession, and the extraction from those devices of electronically stored information.

2. Your affiant has been employed as a DEA Special Agent ("SA") since 2001. As such, your affiant is a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a Search Warrant. As a Special Agent, your affiant has experience and training in the investigation of crimes involving narcotics offenses, including, among other things, the use of confidential informants and undercover agents, the execution of search warrants, the interrogation of suspects, the seizure of narcotics and related proceeds, and retrieval and analysis of telephone data, including location information.

3. Through training and experience, your affiant is familiar with the operation of domestic and international drug trafficking organizations and the ways in which those drug

1

traffickers conduct their business – including the methods and means in which they obtain, manufacture, import, and distribute narcotics; make drug payments and launder drug proceeds; and, communicate with organizational members. Your affiant's training and experience as a law enforcement officer, review of pertinent documents, and conversations with local, state, and federal law enforcement officers form the basis of the opinions and conclusions set forth below.

   4. Your affiant knows, based upon his training and experience, as well as information relayed to your affiant during the course of your affiant's official duties, that members of drug trafficking organizations routinely utilize wire, electronic, and application communication facilities, such as hard line telephones, cellular telephones, push-to-talk (PTT) two-way radios, public telephones, WhatsApp Messenger, BlackBerry Messenger, Text Free, Facebook, and other electronic means to communicate operational directives, and information concerning the conduct of the organization's illegal activities to other organization members. During the course of these wire and electronic communications, organization members routinely utilize coded references concerning their illegal activities, in an effort to avoid detection by law enforcement. Your affiant also knows that narcotics traffickers routinely use prepaid telephones requiring no subscriber information, and often use fictitious names or the names of other individuals to register telephones, vehicles, real property, and utility services, in order to avoid detection by law enforcement.

   5. Based upon training, experience, and participation in this and other drug trafficking investigations, your affiant has reason to believe, and does believe, that individuals who deal in illegal drugs commonly maintain addresses or telephone numbers in books, papers, electronic devices including pagers, mobile phones, and caller identification devices, which reflect names, addresses, and/or telephone numbers for their associates in their illegal organization. In addition, these individuals utilize telephone systems to maintain contact with their associates in their illegal

business. These telephones are often mobile telephones, pagers, automatic dialing devices and other electronic devices, and are kept in places which they have access to and control.

6. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of your affiant's knowledge about this matter.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

7. The device to be searched is one Alcatel flip phone, black in color, recovered from Romel BOLGER's Kia Sorrento subsequent to his arrest on August 19, 2020 ("SUBJECT PHONE").

## PROBABLE CAUSE

9. Your affiant makes this affidavit in support of an application for a Search Warrant for the SUBJECT PHONE, in connection with an investigation into the drug trafficking activities of ROMEL BOLGER and KASIB NASSAM PARHAM, as described below. The facts set forth in this affidavit are based on my personal observations and investigation, as well as information obtained from other individuals, including law enforcement personnel and a DEA confidential source ("the CS").

10. The CS has previously provided reliable information, which has led to multiple arrests and prosecutions. The CS has one prior arrest for a drug-related offense, but s/he cooperated with law enforcement at the time, in exchange for dismissal of charges. The CS has no prior convictions, and works with DEA and local law enforcement agencies for monetary compensation. I am aware that on one occasion, the CS denied residing at a certain address when asked by defense counsel when in fact the CS did reside at that address. The CS did so out of a concern of personal safety and disclosed that fact to the prosecution later that same day. I do not believe this negatively impacts the CS's reliability, but I disclose it now out of an abundance of

caution and in candor to the Court.

11. Because this affidavit is submitted for the limited purpose of establishing probable cause to obtain a Search Warrant for the SUBJECT PHONE, I have not included every fact known to me or to other law enforcement officers. Rather, I have set forth only those facts necessary to establish probable cause.

12. On or about mid-August 2020, the CS received information that an individual from the Philadelphia area subsequently identified as Romel BOLGER was interested in purchasing kilogram quantities of cocaine. Subsequent to the CS receiving this information, the CS had a drug related conversation with BOLGER utilizing phone number 332-217-9878, the phone number assigned to a cell phone located on BOLGER's person subsequent to his arrest on August 19, 2020 (hereinafter "BOLGER PHONE"). To confirm that BOLGER PHONE shared the number used by the CS to reach BOLGER, Your Affiant dialed phone number 332-217-9878 from his work cell phone when BOLGER PHONE was turned on close by, and BOLGER PHONE rang with your Affiant's work cell phone number appearing BOLGER PHONE's screen.

13. During the aforementioned phone call involving BOLGER PHONE and the CS, the CS and BOLGER agreed that the CS would provide BOLGER with fifteen (15) "white shirts" for thirty-five thousand (35,000). In a subsequent phone conversation involving BOLGER PHONE, the CS directed BOLGER to contact a purported associate of the CS, who is a Law Enforcement Officer acting in an Undercover Capacity ("UC"). Both of these phone conversations were recorded.

14. Based on my training and experience, I believe that the "white shirts" referenced in the aforementioned conversation are actually kilograms of cocaine, and that the CS agreed to provide BOLGER with fifteen kilograms of cocaine for thirty-five thousand dollars per kilogram.

15. Subsequent to conversations between the CS and BOLGER, the UC contacted BOLGER via BOLGER PHONE. In that conversation, BOLGER and the UC agreed to meet personally and talk. This phone conversation was recorded.

16. On or about August 14, 2020, the UC and BOLGER met personally in Delaware County, Pennsylvania. The UC told BOLGER that the UC could provide the purported fifteen (15) kilograms of cocaine. BOLGER told the UC that BOLGER would be willing to purchase thirty (30). The UC told BOLGER that the UC would have to talk to his/her people and would follow up with an answer. Subsequent to this meeting, the UC confirmed BOLGER's identity via BOLGER's Pennsylvania Driver License Photo, corresponding to Pennsylvania Driver License number 26705041.

17. On or about August 16, 2020, the UC had a conversation with BOLGER via BOLGER PHONE. The UC told BOLGER that the UC could provide twenty-seven (27). BOLGER then told the UC that he [BOLGER] needs to make the money right. Later that same day, the UC and BOLGER had another phone conversation utilizing BOLGER PHONE, during which the UC told BOLGER that the UC could "do twenty two (22)." BOLGER replied that he "should be pretty good on that." BOLGER and the UC agreed to do the exchange on or about August 19, 2020.

18. On or about August 17, 2020 at approximately 8:47 PM, the UC placed an outgoing text message to BOLGER via BOLGER PHONE which read "How we looking." On the same day, at approximately 8:47 PM, the UC received at text message from the BOLGER PHONE that read "We looking good for 20." On the same day at approximately 8:53 PM, the UC sent a text message to BOLGER PHONE that read "C U soon." On the same day at approximately 8:54 PM, the UC phone received a text message from BOLGER PHONE that read "Solid."

19. Based on my training and experience, I know that the number 20 referenced in

5

paragraph 18 is actually referencing 20 kilograms of cocaine that BOLGER intended to purchase from the UC on August 19, 2020.

20.     On August 19, 2020 at approximately 1:21 PM, the UC placed an outgoing text message to BOLGER PHONE, directing BOLGER to be in town around 2:30 to 3:00 pm.  The following texts and phone calls with BOLGER utilized BOLGER PHONE.  BOLGER then asked what area. The UC replied that the UC would send the location for the meet by text.  The UC then had a phone conversation with BOLGER during which the UC said he would be accompanied by another person (hereinafter "UC2").  BOLGER also said he would bring another person.  The UC and BOLGER agreed that it would not be a good idea to bring many people. The UC provided details to BOLGER regarding how the transaction would occur; specifically, BOLGER would need to show UC the money, then UC would show the product (i.e., cocaine), then BOLGER would follow the UC to a hotel room where the money would be counted.  The UC asked BOLGER if he [BOLGER] had "the product" (referring to money), to which BOLGER replied "yeah."

21.     At approximately 2:38 PM, the UC sent a text message to BOLGER via BOLGER PHONE, indicating the address of the meet location, which was the Royal Farms located at 105 Stewart Avenue, Ridley Park, PA ("ROYAL FARMS").  BOLGER responded in the affirmative.

22.     At approximately 2:42 PM, BOLGER sent the UC a text message stating that he [BOLGER] would advise when he [BOLGER] was close by.  At approximately 2:44 PM, surveillance units observed BOLGER walk out of the garage door of 179 Wilde Street, Drexel Hill, PA, carrying a dark colored duffel bag.  BOLGER then walked toward a burgundy Kia Sorrento bearing Pennsylvania license plate KDN0585 ("KIA"), placed the bag into the driver's side of the KIA, then got into the driver's seat and drove away.

23.     At approximately 3:39 PM, BOLGER texted UC that he [BOLGER] was 10 minutes

away. At approximately 3:44 PM, surveillance units observed the KIA pull into the parking lot of the Royal Farms and pulled up in front of a gas pump. At approximately 3:46 PM, BOLGER texted the UC "pump 14." As BOLGER was at the gas pump, a male who came from a black Nissan Maxima bearing a PA license plate ("MAXIMA"), subsequently identified as KASIB NASSAR PARHAM ("PARHAM") walked over to BOLGER and engaged him in conversation. The UC texted BOLGER, directing BOLGER to meet the UC in the back of ROYAL FARMS lot where the UC was parked. Surveillance units observed BOLGER get into the KIA and PARHAM get into the MAXIMA and the two of them then drove to the parking lot area where the UC was waiting.

24. The UC instructed BOLGER to park next to his vehicle. BOLGER did so and got out of his car and walked to the UC's passenger door. BOLGER expressed his concern about a vehicle in the parking lot which was unrelated to this investigation. BOLGER asked if the UC wanted to see the money. The UC got out of his car and walked to the passenger side of the KIA where BOLGER showed the UC an open black bag which contained a large amount of United States Currency. The UC asked BOLGER if all of the money was in the black bag, to which BOLGER replied that the rest of the money was in the MAXIMA driven by PARHAM. BOLGER pointed out the MAXIMA to the UC. BOLGER then pointed to a second black bag in his KIA and told UC that the second bag contained the money counter.

25. The UC told BOLGER that UC would have "his guy" (referring to UC2) bring a couple kilograms over for BOLGER to inspect, to which BOLGER replied that he [BOLGER] wanted to see the hotel room. The UC departed from the ROYAL FARMS lot and went to the Red Roof Inn, Tinicum Township, Delaware County (RED ROOF INN). BOLGER drove the KIA and PARHAM drove the MAXIMA to follow the UC to the RED ROOF INN. The UC then called

7

UC2 and told UC2 to meet the UC in the parking lot of the RED ROOF INN. Upon arrival at the parking lot of the RED ROOF INN, the UC texted BOLGER, directing BOLGER to get into the UC's vehicle. BOLGER got into the front passenger seat of the UC's vehicle. UC2 then arrived on scene and got into the rear driver seat of the UC's vehicle. UC2 had a bag containing five (5) kilograms of cocaine. UC2 showed BOLGER the bag with the five (5) kilograms of cocaine. UC2 handed BOLGER a knife and a kilogram of cocaine. BOLGER then cut into the kilogram of cocaine and expressed his satisfaction with the cocaine. BOLGER commented that the kilogram was "cracked." At that point, the UC, UC2 and BOLGER got out of the UC's vehicle, and UC2 retrieved a suitcase from his car. At approximately the same time, BOLGER made a call on a dark colored cell phone, and stated "all good" into the dark colored cell phone. After getting out of the UC's vehicle, BOLGER motioned for PARHAM to exit the MAXIMA and enter the hotel with BOLGER. PARHAM got out of the MAXIMA, went to the trunk of the MAXIMA and retrieved two bags from the trunk. BOLGER retrieved two bags from the KIA. BOLGER, the UC and UC2 all walked towards the hotel as PARHAM was still at his car. PARHAM then walked towards the others on scene and joined them.

26.   BOLGER, PARHAM, the UC, and UC2 all walked to the hotel and up a set of steps as if headed to a particular room.

27.   At approximately 4:05 PM, Law Enforcement officers affected the arrest of BOLGER and PARHAM on the second floor walkway of the RED ROOF INN. At the time of arrest, BOLGER was carrying two duffel bags, one contained a large amount of United States Currency, and the other contained a money counter. The currency was officially counted and found to be in the amount of $300,160. PARHAM was carrying one duffel bag which contained a large amount of United States currency and one backpack containing a scale, baking soda, an electric

heating element, a butter knife and a glass cooking pan. Based on my training and experience, the items contained in the backpack carried by PARHAM are paraphernalia for the manufacture of drugs. The currency in the bag PARHAM carried was officially counted and found to be in the amount of $399,730. The BOLGER PHONE and a second cell phone were recovered from BOLGER's pants pocket, and two cell phones were recovered from PARHAM's pants pocket ("PARHAM PHONES"). A third individual, F.P., was also detained while seated in the passenger seat of the KIA.

28. The five (5) kilograms of cocaine that were presented to BOLGER have previously been tested by the Pennsylvania State Police Regional Laboratory and were found to contain cocaine.

29. A search of the KIA was conducted pursuant to a Search Warrant authorized by the Honorable Walter Strohl, Magisterial District Judge for Delaware County, Pennsylvania. Among other items, law enforcement recovered the SUBJECT PHONE from the center console cup holder of the KIA. Law enforcement also recovered a black wallet from the center console of the KIA containing a Social Security Card in the name of ROMEL DARNELLE BOLGER, a Pennsylvania Driver's License number 26705041 in the name of ROMEL D BOLGER, and two (2) Pennsylvania State Access Benefit Cards in the name ROMEL D BOLGER.

30. A search of 179 Wilde Avenue, Drexel Hill, Pennsylvania (the property from which BOLGER exited with the duffel bag) was conducted pursuant to a Search Warrant authorized by the Honorable Walter Strohl, Magisterial District Judge for Delaware County, Pennsylvania. Among other items, law enforcement recovered a brown box that was stuffed full of United States currency. This brown box had a label on it and the label was addressed to "KASIB PARHAM, 215-824-7726, UNIT 202, 1210 Chestnut Street, Philadelphia, PA 19107."

31.     A search of 1210 Chestnut Street, Philadelphia, Pennsylvania, Unit 202, conducted pursuant to a Search Warrant authorized by the Honorable Patrick Stack, Philadelphia Municipal Court, yielded approximately 1 gram of crack cocaine, unused small baggies commonly used for the packaging of drugs, a heat sealer, a digital scale and a money counter.  The aforementioned paraphernalia is consistent with what is used to manufacture drugs.

32.     On or about August 24, 2020, SA Orest Zachariasevych dialed phone number 215-824-7726 from his work cell phone when the PARHAM PHONES were close by, and at the same time, one of the PARHAM PHONES rang with SA Zachariasevych's work cell phone number appearing on the screen.

33.     Based on the circumstances presented regarding the interactions between UC, UC2 and BOLGER, including the recovery of multiple cell phones from BOLGER and PARHAM, I believe that the SUBJECT PHONE will reveal additional evidence of drug trafficking.

## SCOPE AND MANNER OF EXECUTION:
## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

34.     Based on your affiant's knowledge, training, and experience, your affiant knows that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

35.     The applied-for warrant would authorize the forensic examination of the SUBJECT PHONE for the purpose of identifying evidence of violations of Title 21 of the United States Code. This evidence includes, but is not limited to, electronically stored information such as names, addresses, telephone numbers, telephone directories, call logs (including dialed, received, and

missed calls), photographs, images, videos, and text messages and other electronic communications (including sent, received, and deleted text messages).

36.     This application also seeks authorization to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used them, and when they were used.

37.     There is probable cause to believe that this forensic electronic evidence might be on the devices because:

      a.      Data on the storage medium (internal memory, SIM card, or other removable data storage device) can provide evidence of a file that was once on the storage medium, but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

      b.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

      c.      The process of identifying the exact electronically stored information on storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on the device is evidence may depend on other information stored on the device and the application of knowledge about how the device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

        d.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

        38.      Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which your affiant is applying would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including, but not limited to, computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

        39.      Manner of execution. Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. This search is justified at any time, as the device is in possession of another law enforcement agency and the search and seizure of the device will not interfere with any possessory rights. Consequently, your affiant submits there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

40. Therefore I believe a search of the electronic files and memory of the SUBJECT PHONE seized will yield evidence of violations of federal law, specifically Title 21, United States Code, Sections 841 (a)(1) and 846, including but not limited to the evidence disclosing the identities and cellular telephone numbers of persons involved in the commission of these drug trafficking offenses. Evidence of calls, contacts, voicemail messages, text messages, and/or emails made to, by, for, and among the drug trafficking associates, as well as access to social networking sites in the course of events related to this affidavit are also expected to be disclosed by the requested search. Your affiant requests that a Search Warrant be issued for the SUBJECT PHONE, more fully described in Attachment A, to include any attached removable data storage device(s), such as a SIM card and/or other removable storage device, and to search for and seize the items listed in Attachment B.

/s/ Orest Zachariasevych
_____
Orest Zachariasevych
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me
this __5th__ day of November, 2020.

/s/ Jacob P. Hart
_____
HONORABLE JACOB P. HART
United States Magistrate Judge
Eastern District of Pennsylvania

## ATTACHMENT A

DESCRIPTION OF PROPERTY TO BE SEARCHED

The following digital device (the "SUBJECT PHONE"), seized on August 19, 2020 and currently maintained in the custody of the Drug Enforcement Administration at 600 Arch Street in Philadelphia, Pennsylvania: one Alcatel flip phone, black in color, recovered from ROMEL BOLGER's Kia Sorrento on August 19, 2020.

# ATTACHMENT B

DESCRIPTION OF ITEMS TO BE SEIZED

Any and all evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846, including:

(1) All wire and electronic communications stored within the telephone's internal memory, SIM card, or other removable data storage device (e.g. memory card) attached to the telephone, which will constitute evidence of the listed offenses. For example, wire and electronic communications between Romel BOLGER, Kasib Nassar PARHAM, and other unknown individuals, who discussed the trafficking of cocaine, the laundering of bulk United States Currency, or showing communication with other potential co-conspirators. These stored communications may include, but are not limited to, saved voice messages; text messages; instant messages; emails; other correspondences; notes and memoranda; call logs; etc., as well as related data that has been deleted, but remains on the telephone's internal memory, SIM card, or other removable data storage device, which may be recovered by the agents.

(2) Video clips and photographs digitally stored within the telephones' internal memory, SIM card, or other removable data storage device, which will constitute evidence of the listed offense, and/or will help agents to identify other persons who are involved in the above-listed offense or assets that are subject to forfeiture; and

(3) Calendars, appointment books, telephone directories and contact lists, planners, address books, and personal notes that include personal telephone directories, telephone lists, and associate names that are stored electronically in the telephones' internal memory, SIM card, or other removable data storage device, which will constitute evidence of the listed offense, and/or will help agents to identify other persons who are involved in the above-listed offense.